## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————
)
)
**HENRY J.B. DICK, Ph.D.,**                     )
)
        **Plaintiff,**                              )
)
     **v.**                                       )
)    **Case No. 21-cv-10007-DJC**
)
**WOOD HOLE OCEANOGRAPHIC**          )
**INSTITUTION and KATHI BENJAMIN,**   )
)
     **Defendants.**                             )
)
)
———————————————————————

### MEMORANDUM AND ORDER

**CASPER, J.**                                                                    **July 26, 2021**

## I.  Introduction

Plaintiff Henry J.B. Dick, Ph.D. ("Dick") has filed this lawsuit against Defendants Wood Hole Oceanographic Institution ("WHOI") and Kathi Benjamin ("Benjamin") (collectively, "Defendants") alleging age discrimination in violation of the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* (Count I against WHOI), age discrimination in violation of the Massachusetts Fair Employment Practices Act, Mass. Gen. L. c. 151B § 4 (Count II against WHOI and Benjamin), gender discrimination in violation of Title IX, 20 U.S.C. § 1681, *et seq.* (Count III against WHOI), breach of contract (Count IV against WHOI), breach of the implied covenant of good faith and fair dealing (Count V against WHOI), tortious interference with advantageous relations (Count VI against WHOI and Benjamin) and defamation (Count VII

against WHOI).  D. 1.  Defendants have moved to dismiss Counts I thru VI.  D. 14.  For the reasons stated below, the Court ALLOWS the motion.

## II.  Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein.  Id.  Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.  Id.  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the conduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (citation omitted).

## III.  Factual Background

The following summary of facts is based upon the allegations in the complaint, which the Court must assume to be true for the purpose of resolving the motion to dismiss.  Dick is a Senior Scientist with tenure at WHOI, a not-for-profit corporation dedicated to ocean research, exploration and education.  D. 1 ¶¶ 1, 2, 11.  His tenure rights as a Senior Scientist with tenure are delineated in WHOI's "Appointments and Promotion Procedures for the Scientific and Technical Staffs and Departmental Assistants" Policy (the "Blue Book").  Id. ¶ 13.  Given Dick's tenure status, according to the Blue Book, he may only be terminated "for cause" or as a result of "financial exigency." Id.

2

A.    <u>The Ocean Research Cruise</u>

Dick's research focuses on how the Earth's crust is formed at ocean ridges and the relationship between mantle flow, melting and ridge tectonics.  <u>Id.</u> ¶ 16.  As part of his research, Dick participates and leads ocean research cruises to collect data and survey the ocean floor.  <u>Id.</u> ¶ 17.  His primary source of funding for ocean research cruises is the National Science Foundation ("NSF"), an independent federal agency.  <u>Id.</u> ¶ 18.  Between February 21, 2019 and March 28, 2019, Dick was the Chief Scientist of a scientific research cruise (the "Cruise") aboard the RV Thomas G Thompson (the "RV Thompson").  <u>Id.</u> ¶ 21.  The Cruise took place in the Indian Ocean, <u>id.</u>, and was funded by NSF through a grant and cooperative agreement with the University of Washington's ("UW") School of Oceanography.  <u>Id.</u> ¶ 22.  Dick was the Principal Investigator for the proposal that led to the Cruise.  <u>Id.</u> ¶ 24.  Planning for the Cruise began in 2018, <u>id.</u> ¶ 25, and Dick was in regular communication with senior members of the scientific party, representatives from NSF and the University-National Oceanographic Laboratory System ("UNOLS") and UW employees (collectively, the "UW Planning Group"), <u>id.</u> ¶ 26.  Dredging technician Justin Smith ("Smith") also participated in some of the Cruise planning.  <u>Id.</u> ¶¶ 26, 37.  Dredging is a method by which samples are collected from the ocean floor.  <u>Id.</u> ¶ 27.  Dick proposed to the UW Planning Group, during pre-cruise planning, that they use power dredging on the Cruise, as rough weather conditions and rough topography were expected in the area.  <u>Id.</u>

On February 13, 2019, eight days before the Cruise, Dick learned that Captain Russell DeVaney ("DeVaney"), with whom he had corresponded in advance of the Cruise, was being replaced by Captain Eric Haroldson ("Haroldson").  <u>Id.</u> ¶ 34.  Once the Cruise began, issues arose due to disagreements between Dick and Smith over dredging techniques.  <u>Id.</u> ¶ 37.  Smith insisted on using the "inch-worm" dredging technique, arguing that any other technique was unsafe.  <u>Id.</u>

3

¶¶ 37, 42.  Haroldson agreed with Smith that power dredging—Dick's preferred technique—was unsafe in rough weather, id. ¶ 44, and the "inch-worm" dredging technique was ultimately used, id. ¶¶ 38-39.  Dick believes this choice of technique resulted in the Cruise's loss of over fifty percent of the anticipated successful dredge hauls.  Id. ¶ 38.

      **B.**      <u>**Conflicts During the Cruise**</u>

Dick had some conflicts during the Cruise.  In one instance, Dick spoke with Sonia Brugger ("Brugger"), marine technician, to ask why dredging had not yet begun despite the Cruise having arrived at its dredging location an hour early.  Id. ¶ 46.  When Brugger explained that dredging was not scheduled to begin for another hour, Dick argued that the normal routine for such operations is to dredge upon arrival.  Id.  Dick and Brugger both raised their voices at each other during this argument.  Id.  In the second instance, Dick stepped under plastic tape on the deck to take photos of an albatross that had landed close to the ship's stern.  Id. ¶ 48.  Dick believed he was in no danger because, among other things, dredging was not set to begin for another fifteen to twenty minutes.  Id.  Brugger yelled at Dick to get off the deck, to which Dick responded that there were no safety issues based on his years of experience dredging.  Id.  Shortly after said incident, on March 11, 2019, Brugger emailed Loren Tuttle ("Tuttle"), Supervisor of Shipboard Science Support Group at UW, that Dick had informed her that "he plans on submitting a report to UNOLS about our horrible conduct and how the ship does not operate properly.  Just wanted to let you know that he plans to leave us a 1-star yelp review."  Id. ¶¶ 81-82.

Smith also emailed a friend during the Cruise about Dick, including such statements as, "[j]ust living the dream as the dredging tech for a real ass of a chief scientist!" and referring to Dick as a "curmudgeon."  Id. ¶ 51.  Smith noted in the email that Dick preferred techniques no

longer implemented in "this day and age." Id. Dick claims that despite these "issues," he made various attempts to get along with everyone on the Cruise. Id. ¶¶ 52-53.

     **C.**    <u>**Post-Cruise Investigation Conducted by WHOI**</u>

     Two days before the end of the Cruise, on March 26, 2019, James Austin ("Austin") of the UNOLS Fleet Improvement Committee ("FIC") contacted Dick. Id. ¶ 54. In response to Austin's email, Dick explained issues he encountered on the Cruise. Id. ¶ 55. Dick's email noted the team's reluctance to dredge in rough waters and the Cruise's failure to meet most of its objectives. Id. Dick asked Austin to hold off on passing along his summary to Haroldson until the Cruise ended. Id. ¶ 56. On April 6, 2019, Larry Madin ("Madin"), former WHOI Deputy Director and Vice President for Research, emailed Dick about an alleged interpersonal incident on the Cruise. Id. ¶ 63. He directed Dick to hold his UNOLS Post Cruise Assessment Report ("PCAR") until after he and Dick met. Id. Dick responded that he was happy to meet with Madin but noted that his PCAR was going to be very negative. Id. ¶ 64. On April 8, 2019, two days later, Haroldson submitted his PCAR. Id. ¶ 65. In the PCAR, Haroldson claimed that Dick proposed unsafe dredging techniques and that Dick was constantly confronting the watch mates with changing instructions about where and when to dredge. Id. Haroldson further claimed that Dick attempted to get the second and third mates to dredge in defiance of his authority. Id.

     Dick forwarded Madin his earlier email exchange with Austin from March 26, 2019, id. ¶ 67, and identified a member of the scientific party who also had issues with Brugger, id. ¶ 68. Madin informed Dick that he did not need to bring any witnesses to the meeting and that Madin had already received input. Id. ¶ 69. According to Dick, WHOI contacted two of the witnesses Dick initially suggested WHOI contact. Id. Benjamin, WHOI's Senior Director of Human Resources and Equal Employment Opportunity ("EEO") Officer, also separately told Dick not to

submit further information for WHOI's investigation.  Id. ¶¶ 3,70.  She also told Dick not to ask witnesses to the events on the Cruise to provide information, stating that "[r]eaching out to others on the cruise, and in particular anyone directly involved in whatever the incident was, should be avoided."  Id.  On April 10, 2019, Dick met with Madin and Benjamin.  Id. ¶ 76.  At the meeting, they informed Dick that there had been a complaint and there would be an investigation.  Id.  UW conducted its investigation by reviewing fifteen written statements from its employees and contractors and conducted one interview with Brugger.  Id. ¶ 77.  UW did not attempt to contact Dick during the investigation.  Id.

On May 22, 2019, UW sent a letter to WHOI claiming it had investigated and determined that Dick had allegedly, among other things, created a hostile work environment through verbal conduct and insistent behavior, and engaged in disrespectful behavior based on gender.  Id. ¶ 90.  On July 17, 2019, Dick met with Benjamin and Dr. Susan Humphris ("Humphris"), Interim Deputy Director and Vice President for Research who had replaced Madin, who had retired on June 1, 2019.  Id. ¶¶ 90, 98.  At this meeting, Dick was provided a version of the UW report and given thirty minutes to review prior to three hours of questioning.  Id. ¶ 99.  On July 19, 2019, Dick was questioned by Benjamin and Humphris for another three hours, and again on August 2, 2019 for two hours.  Id. ¶ 101.  Benjamin requested written statements from Haroldson and Smith and interviewed Brugger, as well as others.  Id. ¶¶ 103, 106.

### D.      WHOI Investigation Findings and Disciplinary Action

On October 28, 2019, Dick was informed that he had violated numerous WHOI policies, id. ¶ 108, and was given a letter (the "WHOI Report"), alleging that he 1) created a harassing and hostile work environment through alleged inappropriate, unprofessional and intimidating behaviors; 2) did not exhibit model leadership behavior reflective of the Chief Scientist Role; 3)

did not adequately plan for the Cruise; 4) complained about and improperly challenged the Captain's authority; 5) made the female technician uncomfortable; 6) exhibited retaliatory behavior during the WHOI Investigation; and 7) had a defiant and nonapologetic demeanor during the WHOI investigation, id. ¶ 109.  As a consequence of Dick's violations, WHOI decided that: (1) he would not be permitted to hold a leadership position such as Chief Scientist on any cruise or research vessel while employed by WHOI; (2) WHOI would report these findings to NSF and UW; (3) he would receive a fifteen percent pay decrease and was not be eligible for a merit increase in 2020; (4) he would be required to take anger management training; (5) he would be required to watch a video on shipboard civility with Benjamin; (6) he would not retaliate nor seek to engage any Cruise crew members to identify who made statements; (7) he would be required to review and adhere to WHOI policies on respectful workplace and workplace harassment; (8) he would be required to review a UW training video entitled, "Preventing Sex Discrimination and Sexual Harassment in the Work Environment"; and (9) any future similar or related incidents would likely lead to termination of his tenure appointment.  Id. ¶ 111.

On February 28, 2020, WHOI sent the following statement to NSF:

The Institution received a written complaint from the University of Washington reporting concerns that Dr. Henry Dick, had repeatedly exhibited unprofessional behavior and conduct when he was the Chief Scientist for the Marion Rise cruise [UNOLS TN365] on the RV Thomas G Thompson.  The unprofessional behavior and conduct were reported to have occurred both during the pre-cruise planning and during the cruise itself.  The Institution conducted an investigation and Dr. Dick was found to have violated the Institution's Code of Conduct, Policy against Harassment, Respectful Workplace and Violence Prevention.  Appropriate action in keeping with the nature of these concerns is being addressed with Dr. Dick, including but not limited to: 1) not permitted to hold a leadership position such as Chief Scientist on any cruise or research vessel while employed by the Institution; 2) received an adjustment to his compensation; 3) required to take Anger Management Training; 4) required to complete identified trainings and reread and acknowledge specific policies; 5) reminded that there can be no retaliation.

Id. ¶ 154.

7

IV.     **Procedural History**

On March 10, 2020, Dick filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and Equal Employment Opportunity Commission ("EEOC") asserting claims of age discrimination against WHOI and Benjamin.  Id. ¶ 6.  On October 30, 2020, Dick withdrew his charge of discrimination from MCAD to file a private cause of action in civil court.  Id. ¶ 7.  Dick instituted this action on January 4, 2021.  D. 1. Defendants now have moved to dismiss.  D. 14.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 29.

V.      **Discussion**

A.      **Age Discrimination (Counts I and II)**

Dick alleges that WHOI and Benjamin held his age against him during the WHOI investigation and consequently subjected him to a deficient investigation.  D. 1 ¶¶ 158-165.  The ADEA and Mass. Gen. L. c. 151B "make it unlawful for an employer to take adverse action against an employee because of his or her age."  Connolly v. Shaw's Supermarkets, Inc., 355 F. Supp. 3d 9, 15 (D. Mass. 2018); see 29 U.S.C. § 623(a)(1); Mass. Gen. L. c. 151B, § 4.  To establish a prima facie case of age discrimination, in the absence of any direct evidence of discrimination, a plaintiff must show: "(1) [he is] a member of a protected class; (2) [he is] qualified for [his] job; (3) [he has] suffer[ed] an adverse employment action at the hands of [his] employer; and (4) [there is] some evidence of a causal connection between [his] membership in a protected class and the adverse employment action."  Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 313 (1st Cir. 2016) (quoting Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 70 (1st Cir. 2011)).  A plaintiff need not plead facts sufficient to establish "a prima facie case . . . in order to survive a motion to dismiss," Swierkiewicz v. Sorema N. A., 534 U.S. 506, 511 (2002), but "must plead enough facts to make

entitlement to relief plausible," <u>Higgins v. State St. Corp.</u>, 323 F. Supp. 3d 203, 206 (D. Mass. 2018).  "Put simply, the complaint has to allege a plausible basis for a claim of discrimination, not just unfair treatment." <u>Alicea v. N. Am. Cent. Sch. Bus, LLC</u>, 232 F. Supp. 3d 213, 215 (D. Mass. 2017) (emphasis omitted).

Here, Dick asserts that he is a member of a protected class, as he was 73 years old at the time of the WHOI report, D. 1 ¶ 137, and suffered an adverse employment action given WHOI's decision to reduce Dick's salary, bar Dick from serving as Chief Scientist on future cruises and report the investigation's conclusions to NSF, Dick's major source of research funding, <u>id.</u> ¶ 159. <u>See</u> <u>Garmon</u>, 844 F.3d at 314 (noting that "[a]n adverse employment action 'typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits'" (internal quotation marks omitted) (quoting <u>Cham v. Station Operators, Inc.</u>, 685 F.3d 87, 94 (1st Cir. 2012)).  Dick fails to allege plausibly, however, a causal connection between his age and WHOI's decision.  Dick's sole allegation evidencing age discrimination is a statement by Madin, asserting that Dick was "getting older and the world has moved on" and that Dick "needed to realize that and to catch up with it," or words to this effect.  D. 1 ¶ 163.  Similarly, Dick mentions a comment made by Smith regarding Dick's preference for using outdated dredging techniques, referring to Dick as a "curmudgeon."  <u>Id.</u> ¶ 51.  Madin retired and was replaced by Humprhis on June 1, 2019, months before WHOI completed its investigation or imposed the adverse employment action, <u>id.</u> ¶ 98, and Smith was a UW employee with no asserted connection to WHOI, <u>id.</u> ¶ 146.  Although Dick underscores that Madin played a role at the start of the WHOI investigation, D. 20 at 4, the alleged statement was made in 2018, D. 1 ¶ 148, pre-dating the Cruise, which did not occur until February 2019, <u>id.</u> ¶ 21.  Given that Madin retired in June 2019, <u>id.</u> ¶ 98,

9

Madin was not present for, nor played a role in WHOI's ultimate employment decision (which is true, even as alleged, for Smith too), but even if either had played a part in the decision-making process, such isolated statements as those alleged by Madin and Smith, are inadequate to allege an age discrimination claim.  See Morales-Cruz v. Univ. of Puerto Rico, 676 F.3d 220, 226 (1st Cir. 2012) (noting that an employment discrimination claim cannot be grounded on "offhand comments[ ] and isolated incidents (unless extremely serious)" (internal quotation marks omitted) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

Dick also references an instance in January 2019 in which a student from Peking University applied to be his student at WHOI and WHOI rejected the application based on allegations that Dick had "mentoring problems."  Id. ¶ 149.  Dick asserts that "[u]pon information and belief, Dr. Dick's younger colleagues are not similarly refused students based on unfounded allegations of having 'mentoring problems.'"  Id.  While Dick alleges that the purported mentoring problem is unfounded, his belief that applicant's denial was another reason is not sufficient to allege that the actual basis for denial is related to age.  See Minahan v. Town of E. Longmeadow, No. 3:12-cv-30203-MAP, 2014 WL 7883586, at *7 (D. Mass. Sept. 11, 2014), report and recommendation adopted in part, rejected in part, No. 12-cv-30203-MAP, 2015 WL 668451 (D. Mass. Feb. 17, 2015) (concluding plaintiff failed to state a claim where she failed to "allege additional facts that would make her claim for relief plausible" beyond the assertion that younger employees' requests were accepted while hers was denied); see also Higgins, 323 F. Supp. 3d at 207 (noting that "'[i]t is not enough' to allege that the plaintiff is a member of a protected class and was subject to an adverse employment action" (quoting Alicea, 232 F. Supp. 3d at 215)).

Although Dick asserts his age discrimination claim pursuant to Mass. Gen. L. c. 151B, § 4 against Benjamin as well, D. 1 ¶¶ 162-65, he fails to allege any facts supporting the assertion that

Benjamin engaged in discriminatory action against Dick.  Mass. Gen. Laws c. 151B, § 4 makes it unlawful to "coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected" by chapter 151B, and "prohibits interference with an employee's right to work in an environment free of unlawful [age] discrimination."  Araujo v. UGL Unicco–Unicco Operations, 53 F. Supp. 3d 371, 383 (D. Mass. 2014) (internal quotation marks and citation omitted).  Dick asserts that Benjamin and WHOI "discriminated against [him] in the terms and conditions of his employment," held "Dick's age against him during th[e] investigation" and "subject[ed] [ ] Dick to harsh disciple based on his age."  D. 1 ¶¶ 163-64.  He furthers that Benjamin aided and abetted discrimination against Dick, in violation of Mass. Gen. L.c. 151B, § 4(5).  Id. ¶ 164.  Dick fails, however, to point to any facts supporting the contention that Dick's age affected Benjamin's investigation or that her actions were in any way based on or related to Dick's age.  The comments he asserts from Madin and Smith were unrelated to Benjamin's role in the WHOI investigation, id. ¶¶ 51, 163, and he alleges no comments or actions made by Benjamin indicating discriminatory bias.  In Dick's opposition, he argues that Benjamin "displayed her age bias directly in the WHOI investigation report, which she drafted, by sanctioning Dr. Dick based in part, on his alleged 'arrogance' and 'ineffectiveness' due to the number of years (43) of Dr. Dick's experience with dredging, i.e., his age."  D. 20 at 5.[1]  The report Dick refers to, however, merely states that Dick "often referred to [his] experience of conducting dredging operations over a 43-year period and professed the belief that [he] knew more about the subject than everybody else did," and that "[t]his arrogance contributed to adversarial relationships" on the Cruise.  D. 1-29 at 3.  General references to the duration of Dick's career—

---

[1] Defendants dispute whether Benjamin drafted the Note.  D. 25 at 4.  As the letter was drafted on Benjamin's letterhead, however, see D. 1-29, and accepting Dick's factual allegations as true, García-Catalán, 734 F.3d at 103, the Court's analysis will proceed here under the assumption Benjamin drafted the letter.

11

particularly where the letter refers solely to Dick's own references to the length of his tenure—do not infer a negative bias toward Dick's age. Morales-Cruz, 676 F.3d at 226 (dismissing claim where referenced descriptors were "without exception gender-neutral"). Without any asserted facts to support a "causal connection" between WHOI and Benjamin's disciplinary action and Dick's age, Dick has failed to state a plausible claim upon which relief can be granted.

**B.    Sex Discrimination (Count III)**

Dick alleges WHOI violated Title IX under "erroneous outcome and/or selective enforcement theories," D. 1 ¶ 170, asserting that allegedly unfair facets of the WHOI investigation, including WHOI's refusal to provide Dick with a copy of the unredacted UW report or permit Dick to present statements from colleagues offering a conflicting viewpoint as to what occurred on the Cruise were due to WHOI and Benjamin's gender biases, id. ¶ 172. Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88, is a "federal statute barring gender–based discrimination in federally supported educational institutions." Doe v. W. New England Univ., 228 F. Supp. 3d 154, 159 (D. Mass. 2017). Under Title IX, "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Here, Dick alleges that WHOI, a recipient of federal funds, violated Title IX through its erroneous findings and decision to impose discipline when Dick was not guilty of the actions alleged in WHOI's report and where gender bias was a motivating factor behind the report's erroneous findings. D. 1 ¶ 171. "A plaintiff making such an 'erroneous outcome' claim under Title IX must allege 1) 'particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding,' and 2) 'particularized allegation[s] relating to the causal connection between the flawed outcome and gender bias.'" Doe v. Harvard Univ., 462 F.

Supp. 3d 51, 60 (D. Mass. 2020) (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)). "The pleading burden as to the first prong 'is not heavy,'" as a complaint "may allege 'particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge.'" Id. An adequate complaint may also "allege 'particular procedural flaws affecting the proof.'" Id.

Dick raises several procedural flaws, including that: (1) WHOI based its decision to investigate Dick on UW's investigation and report without speaking to Dick; (2) Benjamin, who sought to discipline Dick on multiple occasions in the past, was "deeply involved" with UW's investigation but did not disclose this involvement during WHOI's investigation; (3) WHOI refused to provide Dick with an unredacted copy of the UW report; (4) WHOI did not give Dick an opportunity to present statements from colleagues who offered a "conflicting viewpoint" of what occurred on the Cruise; (5) WHOI did not permit Dick to respond to statements made by witnesses interviewed by WHOI, otherwise confront witnesses or have counsel present or participate in a hearing; and (6) the same individuals who investigated Dick imposed his discipline. D. 1 ¶¶ 172-73. Even if these allegations are sufficient to meet the pleading burden as to the first prong of Dick's erroneous outcome claim, Dick is unable to clear the second hurdle. Dick alleges, in support of his contention of gender bias, that Defendants "immediately credited Ms. Brugger's account of the Cruise," but dismissed an earlier allegation from Dick of having seen a graphic sexual image on Brugger's screensaver, id. ¶ 173, and that Defendants claimed Dick was "typically defiant and unapologetic," which Dick argues constitutes a "male, gender-based stereotypical accusation," id. He furthers that the sanctions imposed against him were more severe due to his gender. Id. ¶ 174.

Dick fails to allege any facts from which to infer reasonably that Defendants credited Brugger's account of the Cruise because of gender or that WHOI's description of Dick as "typically defiant and unapologetic" is a gender-based, stereotypical assertion.  See Doe v. Western New England Univ., 228 F. Supp. 3d 154, 188 (D. Mass. 2017) (concluding plaintiff failed to allege particularized facts permitting factfinder to draw reasonable inference that gender discrimination was a motivating factor behind University investigation's outcome).  Such descriptors as "defiant" or "unapologetic" are gender neutral, as each could be equally applied to individuals of any gender.  See Adkins v. Atria Senior Living, Inc., 113 F. Supp. 3d 399, 411-12 (D. Mass. 2015) (concluding on motion to dismiss that plaintiff failed to establish employer's comment to "play nice in the sandbox" was made "based on perceptions of gender stereotypes"); Morales-Cruz, 676 F.3d at 224 (allowing motion to dismiss where the pertinent terms were "without exception gender-neutral," noting that "[b]y definition, terms that convey only gender-neutral meanings are insufficient to anchor a gender-stereotyping claim").  Also, with respect to sanctions, Dick additionally fails to purport any facts suggesting his sanctions were more severe due to his gender—aside from his conclusory assertion that gender generally played a role in WHOI's investigation—nor does he point to any comparators to support his allegation. Accordingly, without more, Dick's gender-based discrimination claim against WHOI also fails.

## C.     Breach of Contract (Count IV) and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count V)

Dick alleges that WHOI breached the terms of its Blue Book, by imposing "unjust discipline" on Dick without following Blue Book protocol, D. 1 ¶¶ 180-81, or its Investigation Policy, id. ¶ 183.  A plaintiff alleging a breach of contract claim must show (1) that the parties entered a valid contract, (2) the plaintiff performed or was ready to perform his obligations under the contract, (3) the defendant breached the contract and (4) the plaintiff sustained damages

because of the breach.  Cabi v. Bos. Children's Hosp., 161 F. Supp. 3d 136, 160 (D. Mass. 2016).

"[O]n proper proof, a personnel manual can be shown to form the basis of an express or an implied

contract."  Jackson v. Action for Bos. Cmty. Dev., Inc., 403 Mass. 8, 13 (1988).  The factors

considered include whether "(1) the employer had retained the right to modify the manual

unilaterally; (2) the parties had not negotiated the manual's terms; (3) the employee did not sign

the manual or otherwise manifest assent to its provisions; (4) the manual stated that it provided

only 'guidance' about the employer's policies; (5) the employer had not called any 'special

attention' to the manual; and (6) the manual did not recite any fixed period or term of

employment."  Sylvain v. Spaulding Rehab. Hosp. Corp., No. 15-cv-5475-D, 2016 WL 1125940,

at *4 (Mass. Super. Mar. 23, 2016) (citing Jackson, 403 Mass. at 14-15 (holding that employee

could reasonably have relied on the handbook's assurances as a source of contractual rights where

employer had a history of adhering to the terms of its handbook's grievance procedure, had not

reserved the right to modify the manual's provisions unilaterally and had not specified that it could

discharge employees without cause)).  "The 'central inquiry' is whether, considering the context

of the manual's preparation and distribution as well as its specific provisions, an employee would

be objectively reasonable in regarding the manual as a legally enforceable commitment concerning

terms and conditions of employment."  Barry v. Chase Precast Corp., No. 02-cv-1464B, 2004 WL

233323, at *3 (Mass. Super. Jan. 24, 2004).  Employers can "effectively disclaim the conferral of

contractual effect on their employee handbooks, by stating so explicitly and in a sufficiently

prominent manner within the body of the handbook."  Sylvain, 2016 WL 1125940, at *5 (citing

Ferguson v. Host Int'l, Inc., 53 Mass. App. Ct. 96, 103 (2001) (noting that if an employer "does

not want the manual to be capable of being construed by the court as a binding contract . . . [a]ll

that need be done is the inclusion in a very prominent position of an appropriate statement that

there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing")).

Here, the documents Dick refers to—the Blue Book and the Investigation Policy—contain disclaimers of contractual intent.  The Blue Book's disclaimer is centered, in large print, on the cover page of the document, immediately below the title.  D. 16-1 at 28.  It states, "[t]he manual is not intended to be a contract or to form any part of a contract with any employee."  Id.  The Investigation Policy, which can only be accessed via WHOI's Intranet website, has its disclaimer on the site's home page.  Id. at 99.  Similarly, below "Welcome" it states, "[t]he provisions in this WHOI policies are not intended to in any way create any contractual obligations with respect to your employment."  Id.  Given the explicit and prominently situated disclaimers for both the Blue Book and Investigation Policy, WHOI can effectively disclaim the conferral of any contractual effect on either of these employee materials.  Sylvain, 2016 WL 1125940, at *5.

Even if, however, the Blue Book and Investigation Policy were considered contractual agreements, Dick fails to adequately allege that WHOI violated their terms.  Turning first to the Blue Book, the text delineates procedural requirements and Dick's rights "prior to any for cause termination."  D. 20 at 12; D. 25 at 8.  Although Dick compares WHOI's punitive action to termination, this does not make it so.  The Court must interpret a contract according to its plain language and cannot modify or create contract terms.  Owens v. West, 182 F. Supp. 2d 180, 195 (D. Mass. 2001) (noting that "contracts containing unambiguous language must be construed according to their 'plain and natural meaning'") (quoting Smart v. Gillette Co. Long–Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995)).  Here, Dick remains a tenured Senior Scientist and has not, given the plain meaning of "termination" in the employment context, been terminated by WHOI.  Although Dick argues that the punishment imposed by WHOI is comparable to a

termination, the Court cannot alter the alleged agreement's terms to include such variations or broaden what "termination" means.  Id.  Accordingly, without more, Dick has not alleged sufficient facts to support a breach of contract claim pursuant to the Blue Book's terms.  Similarly, turning to WHOI's Investigation Policy, the policy states that the "Lead Investigator"—here, Benjamin—will "report conclusions of any investigation and any recommendations to the Decision-maker (e.g., relevant department chair, Vice-President, Deputy Director, or President and Director, or given less serious matters, a supervisor)."  D. 1-35 at 3.  The Policy does not state, nor can the Court infer, that "the Investigation Policy requires that the investigator and decision-maker be different individuals," as Dick asserts.  D. 20 at 15; D. 25 at 9-10.

Turning to Dick's breach of the covenant of good faith and fair dealing claim, in Massachusetts, "[e]very contract implies good faith and fair dealing between the parties to it." Dooling v. James B. Nutter & Co., 139 F. Supp. 3d 505, 515 (D. Mass. 2015) (quoting Aragao v. Mortgage Electronic Registration Systems, Inc., 22 F. Supp. 3d 133, 140-41 (D. Mass. 2014)).  "A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract."  Id. (quoting Speakman v. Allmerica Financial Life Ins., 367 F.Supp.2d 122, 132 (D. Mass.2005)).  "The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance."  Id.  The covenant may not, however, be "invoked to create rights and duties not otherwise provided for in the existing contractual relationship."  Id. (quoting Aragao, 22 F. Supp. 3d at 141).  Even if considered a contractual agreement, the relevant Blue Book clause solely refers to termination—which did not occur here.  D. 20 at 12; D. 25 at 8. Similarly, as the Investigation Policy contains no requirement for the investigator and decision-

maker to be different individuals, this alleged duty cannot be created by the Court.  Accordingly, both Dick's breach of contract and breach of the implied covenant of good faith and fair dealing claims against WHOI fail to state a claim.

### D.    Tortious Interference with Advantageous Business Relations (Count VI)

Dick alleges that both WHOI and Benjamin interfered with Dick's advantageous business relationship with NSF.  D. 1 ¶¶ 193-203.  Dick asserts that WHOI reported the "false results" of its investigation to NSF with the intention of interfering with Dick and NSF's relationship in bad faith, id. ¶ 196, and that Benjamin interfered with his advantageous business relationship by conducting a procedurally deficient, unfair and discriminatory investigation, id. ¶ 201.  To state a claim for tortious interference with business relations, a plaintiff must allege "(1) the existence of a contract or a business relationship which contemplated economic benefit; (2) the defendants' knowledge of the contract or business relationship; (3) the defendants' intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages."  Karter v. Pleasant View Gardens, Inc., 248 F. Supp. 3d 299, 314 (D. Mass. 2017) (quoting Swanset Dev. Corp. v. City of Taunton, 423 Mass. 390, 397 (1996)).  "It is well established that 'the improper motive or malevolence required is actual malice, a spiteful, malignant purpose, unrelated to the legitimate corporate interest.'"  Sherman v. Clear Channel Outdoor, Inc., 889 F. Supp. 2d 168, 176 (D. Mass. 2012) (emphasis omitted) (quoting King v. Driscoll, 418 Mass. 576, 587 (1994)).  "[P]ersonal dislike will not warrant an inference of the requisite ill will."  Id.

Here, Dick asserts that Benjamin harbored discriminatory animus toward Dick for both his age and gender but alleges no facts to support this contention, nor does he sufficiently allege that Benjamin had any "spiteful, malignant purpose" in conducting her investigation, as required for a

tortious interference claim.  <u>Sherman</u>, 889 F. Supp. 2d at 176 (dismissing interference claim on grounds that allegations of personal gain and personal dislike are inadequate to establish defendant acted with improper means or motive).  Dick alleges that Benjamin "conducted a procedurally deficient" investigation that "falsely painted [Dick] in a negative light, intending to induce WHOI to terminate" him. D. 1 ¶ 201.  He fails, however, to allege plausibly that there was an "actionable improper motive" behind Benjamin's actions, and more specifically, that said motive was "unrelated to [a] legitimate corporate interest."  <u>Sherman</u>, 889 F. Supp. 2d at 176 (internal citations and quotation marks omitted).  Even accepting the non-conclusory allegations of the complaint as true, Dick has failed to establish that Benjamin acted with improper means or motive and, therefore, Dick's tortious interference claim against Benjamin fails.  <u>Id.</u>

Turning to his claims against WHOI, Dick similarly fails to point to an improper motive behind WHOI's report.  While Dick makes the conclusory assertion that WHOI reported the investigation to NSF to intentionally interfere with their relationship, he fails to assert any facts to support the assertion that WHOI did so for an "improper purpose," beyond his general claim that the investigation was unfair or resulted in false results.  <u>Karter</u>, 248 F. Supp. 3d at 314.  For these reasons, the Court dismisses Count VI.[2]

## VI.   Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss as to Counts I thru VI, D. 14.[3]

**So Ordered.**

/s/ Denise J. Casper

---

[2] In light of this ruling, the Court need not reach Defendants' alternative argument invoking the anti-SLAPP statute.

[3] Defendants' motion to dismiss asks the Court to dismiss Counts I-VI of Dick's Complaint.  D. 14.  The motion does not address Count VII of Dick's complaint.  <u>Id.</u>  Accordingly, this claim for defamation against WHOI survives.

United States District Judge