UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                  )
HENRY J.B. DICK, Ph.D.,           )
                                  )        Civil Action
              Plaintiff,          )        No. 21-10007-DJC
                                  )
v.                                )
                                  )
WOODS HOLE OCEANOGRAPHIC          )
INSTITUTION & KATHI BENJAMIN,     )
                                  )
              Defendants.         )
                                  )
```

BEFORE THE HONORABLE DENISE J. CASPER
UNITED STATES DISTRICT JUDGE

VIDEOCONFERENCE
HEARING

April 27, 2021
3:32 p.m.

John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel on behalf of Plaintiff:
      Marc D. Freiberger
 3    Brendan T. Sweeney
      Freiberger & Washienko, LLC
 4    Suite 720
      211 Congress St.
 5    Boston, MA 02110
      617-723-0008
 6    mfreiberger@fwlawboston.com
      bsweeney@fwlawboston.com
 7
      Counsel on behalf of Defendant:
 8    Patrick M. Curran, Jr.
      Ogletree Deakins Nash Smoak & Stewart, P.C.
 9    One Boston Place
      Suite 3500
10    Boston, MA 02108
      617-994-5728
11    patrick.curran@ogletreedeakins.com

12    Christopher Land
      Woods Hole Oceanographic Institution
13    569 Woods Hole Road, MS 14
      Woods Hole, MA 02543
14    508-289-2900
      cland@whoi.edu
15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2          COURTROOM CLERK:  Civil Action 21-10007, Henry Dick v.
3   Woods Hole Oceanographic Institute.  To all participants,
4   pursuant to Local Rule 83.3, persons granted remote access to
5   these proceedings are reminded of the general prohibition
6   against photographing, recording and rebroadcasting of court
7   proceedings.  Violation of these prohibitions may result in
8   sanctions.
9          The Court has allotted one half hour for this, and she
10  will split the time equally between the parties.  Would counsel
11  please state your name for the record, starting with the
12  plaintiff.
13         MR. FREIBERGER:  Marc Freiberger along with Brendan
14  Sweeney for the plaintiff, Dr. Henry Dick.
15         THE COURT:  Good afternoon, counsel.
16         MR. FREIBERGER:  Good afternoon, Your Honor.
17         MR. CURRAN:  Good afternoon.  This is Patrick Curran
18  for Woods Hole Oceanographic Institution and Kathi Benjamin.
19  And with me is Christopher Land who is general counsel for
20  Woods Hole Oceanographic Institution, which I will probably
21  refer to as WHOI or the Institution, since the full name is
22  sort of a mouthful.
23         THE COURT:  Thank you.  Good afternoon.
24         MR. CURRAN:  Good afternoon.
25         THE COURT:  Counsel, I know we're here on the
```

1   defendants' motion to dismiss the first six of the seven

2   claims.  I've had a chance to review the papers on either side

3   through the sur-reply, so I have a sense of the arguments on

4   either side.

5           As Ms. Hourihan indicated, I have to be off by 4:00,

6   so I'll split the time evenly, and I'll watch the clock to make

7   sure that I'm reserving enough time for the plaintiff.

8           Mr. Curran, are you arguing on behalf of the

9   defendants?

10          MR. CURRAN:  I am, Your Honor.

11          THE COURT:  Okay.

12          MR. CURRAN:  Thank you, Your Honor, and may it please

13  the Court.  I'd like to address first the plaintiff's claims of

14  age and sex discrimination.

15          THE COURT:  Sure.

16          MR. CURRAN:  Now, in his opposition and sur-reply, the

17  plaintiff urges the Court to look at the complaint as a whole

18  in evaluating his age and sex discrimination claims.  And we

19  join in that request because when we look at the complaint as a

20  whole, we see a document that's extremely lengthy.  It contains

21  209 paragraphs, 54 pages with 35 exhibits that's focused almost

22  entirely on allegations of unfair treatment and highly detailed

23  explanations designed to excuse or vindicate Dr. Dick's

24  positions with respect to the various scientific and

25  interpersonal disputes that he got into with employees of the

1    University of Washington during the Thompson cruise.

2        And what we also see is that those hundreds of pages

3    contain almost no allegations of any facts that are supposed to

4    suggest age bias, even fewer that are supposed to suggest

5    gender bias.

6        And I'd like to take a first look at the fact they're

7    supposed to indicate gender bias.  And it won't take very long

8    because there are only two supposed gender bias facts alleged

9    in the entire 64-page, 209-paragraph complaint.  Neither of

10   those facts withstand scrutiny as grounds for a gender bias

11   claim.

12       The first one is that WHOI investigated assertions

13   made by a woman, Sonia Brugger, about Dr. Dick but did not

14   investigate Dr. Dick's assertions about Ms. Brugger, which was

15   that he had seen an inappropriate image on her computer.

16       First of all, the assertions that prompted WHOI's

17   investigation of Dr. Dick were not made by just Ms. Brugger.

18   They were made by a number of people, several of whom were men,

19   including the ship's captain.  So it's not the case that this

20   is one woman's assertions and that the Institution just went

21   off and immediately started investigating them.  It was

22   assertions by a number of people, including many men.

23       Second, the fact that WHOI didn't investigate an

24   alleged impropriety by Ms. Brugger does not indicate sex bias

25   on its behalf primarily because Ms. Brugger was an employee of

1  the University of Washington.  She is not and has never been a

2  WHOI employee and WHOI had no basis or reason for investigating

3  her or imposing discipline on her.

4           In his sur-reply, Dr. Dick objects to this point as

5  unavailing because WHOI interviewed Ms. Brugger as part of its

6  investigation.  Ms. Brugger was a witness to the events that

7  WHOI was investigating, and the mere fact that WHOI was able to

8  interview her in the course of the investigation into its

9  employee's conduct, Dr. Dick's conduct, does not indicate that

10  it had jurisdiction to investigate complaints about her to

11  impose discipline on her.

12           The only other facts alleged to suggest sex-based

13  animus is the fact that in the report WHOI described Dr. Dick's

14  conduct during the investigation as, quote, typically defiant

15  and non-apologetic, unquote.  But as we pointed out in our

16  filings, these are gender and neutral adjectives which can be

17  and are often used to describe people of both sexes.  And

18  they're exactly the kind of descriptors that the First Circuit

19  held do not support a reasonable inference of sex

20  discrimination in the *Morales-Cruz* case which we cited in our

21  briefs.

22           In that case the plaintiffs alleged that the

23  defendants described her as, quote, fragile, immature and

24  unable to handle complex and sensitive issues.  And in that

25  case, again, the Court held that that was not suggestive of sex

1   discrimination because those were sex-neutral gender-neutral

2   adjectives.  The same thing goes for the adjectives that Dr.

3   Dick points to in his complaint.

4           So that's it for sex discrimination.  Two alleged

5   facts, neither of which plausibly indicate sex bias on the part

6   of WHOI or Ms. Benjamin.

7           So moving on to the allegation of facts that are

8   supposed to suggest age bias, there are only four of them, and

9   they're found in paragraphs 146 through 150 of the complaint.

10  The first, and this is in paragraph 147, Dr. Dick points to

11  references that Justin Smith, a University of Washington

12  employee, made during the cruise about Dr. Dick's preference

13  for, quote, outdated techniques and principles.

14          Now, to begin with, it's not at all clear that those

15  statements raise an inference of age bias.  Even Dr. Dick

16  himself refers to them only as seemingly ageist.  And in the

17  *Gonzalez v. Ed Dia* case, the First Circuit case that we cited

18  in our briefs, the Court held that the use of terms like

19  old-fashioned and references to, quote, old ways, are not

20  indicative of age-based animus.

21          But even if we assumed that Mr. Smith's comments

22  reflected age bias, they don't indicate age bias on the part of

23  WHOI or Ms. Benjamin for the simple reason that Mr. Smith is

24  not a WHOI employee.  He was an employee of the University of

25  Washington.

1          THE COURT:  What about -- and you may be jumping to

2     this, counsel, but it was Dr. Madin or Madding.

3          MR. CURRAN:  Yeah, I'm going to get to that.

4          THE COURT:  Okay.  Thank you.

5          MR. CURRAN:  I can get to that next if you'd like.  So

6     he points to Dr. Madin's comment that you refer to, and the

7     comment allegedly was that, quote, Dr. Dick was getting older

8     and the world has moved on, and that he needed to realize that

9     and try to catch up with it.  That's at paragraph 148.

10         Our position is that that's a classic stray remark of

11    the kind numerous courts, including the First Circuit in the

12    *Morales-Cruz* case, again have found insufficient to support a

13    discrimination claim unless they're, quote, extremely serious,

14    which Dr. Madin's clearly is not, and Dr. Dick doesn't allege

15    that it is.

16         In his opposition filings, Dr. Dick argues that Dr.

17    Madin's comment is not a stray remark because he was involved

18    in the investigation.  But as we noted in our reply, numerous

19    courts have held that such comments are stray remarks even when

20    made by a supervisor or someone involved in the investigation

21    into the employee's conduct.

22         In fact, one of the cases that Dr. Dick cites in his

23    opposition and again in his sur-reply, that's *Campbell v.*

24    *Bristol Community College*, a Judge Saylor case, Judge Saylor

25    noted in that case that, quote, statements by decisionmakers

1   are stray remarks and as a result they were insufficient to

2   support a claim of discriminatory animus, unless the remark is,

3   quote, related to the decisional process itself.

4          THE COURT:  And I guess, counsel, the other question I

5   had is, you know, here it's a motion to dismiss.  I'm assuming

6   the truth of it, at least the factual allegations, the

7   well-pled factual allegations.  Based on that, what was Dr.

8   Madin's role?  I thought -- meaning, it wasn't clear to me that

9   he was a decisionmaker, but what, based on the allegations, is

10  his role in the investigation in the disciplinary --

11         MR. CURRAN:  Dr. Madin's role, as alleged in the

12  complaint, and I'm sure that plaintiff's counsel can correct me

13  if he sees it differently, but as I read the complaint, Dr.

14  Madin's role was that he was involved in the initial inquiry

15  into the allegations that were being made that WHOI had gotten

16  wind that the University of Washington was investigating in

17  April, I believe April of 2019.  And they had some initial

18  discussions with Dr. Dick about that, Dr. Madin did.  But the

19  investigation itself didn't start until after WHOI had received

20  the University of Washington's report.

21         That investigation began in July of 2019.  By that

22  time, Dr. Madin had retired and had been replaced by another

23  person who conducted the investigation along with Ms. Benjamin.

24  So by that time, Dr. Madin was no longer -- not even involved

25  in the investigation that proceeded from that point and

1    certainly was not involved and is not alleged to have been

2    involved in the decision to impose discipline on Dr. Dick which

3    occurred and was imposed in October of 2019, by which time Dr.

4    Madin had been, you know, retired for five months or so.  So

5    that was his involvement.

6          So Dr. Dick argues also that, even if Dr. Madin's

7    comments were stray remarks, they still may be relevant to

8    showing WHOI's intent if they are, quote, temporally and

9    contextually related to the employment action, unquote.  That's

10   again a quote from Judge Saylor's 2017 case in the *Campbell v.*

11   *Bristol Community College* case.

12         The problem with that argument is that Dr. Dick hasn't

13   alleged any facts indicating that Dr. Madin's remark was

14   temporally and contextually related to the investigation or to

15   the discipline that was imposed on him.  On the contrary,

16   according to the complaint, the remark itself was not made in

17   the context of the investigation or in the imposition of

18   discipline.  Rather it was supposedly made a year or more

19   before the investigation began in 2018.

20         That point is illustrated by the fact of *Campbell v.*

21   *Bristol*, the case that Dr. Dick relies on primarily for this

22   argument.  In that case the stray remark was the very same

23   racial epithet that the plaintiff had said she had been fired

24   for complaining about.  So clearly in that case the remark was

25   temporally and contextually related to the employment action

1    because it was the root cause of the employment action.

2         Same obviously isn't true here.  Dr. Madin's alleged

3    statement made before the cruise began a year or more before

4    the investigation had even gotten underway.

5         THE COURT:  Thank you.  Counsel, just two more

6    minutes, so I don't know if you wanted to reserve any of that

7    for rebuttal or not.

8         MR. CURRAN:  Yeah, I'll reserve the rest of that for

9    rebuttal and rely on my briefs for the rest of the points.

10        THE COURT:  Thank you.

11        MR. CURRAN:  Thank you, Your Honor.

12        THE COURT:  Counsel.

13        MR. FREIBERGER:  Thank you, Your Honor.  So I guess

14   I'd like to start by saying that we vehemently disagree with

15   the characterization that there's these two key claims, two

16   paragraphs on gender bias and four paragraphs on age.

17        What defendants are trying to do is compartmentalize

18   and dismiss so much of the complaint.  And what this comes down

19   to is an outrageously one-sided investigation that was

20   conducted by WHOI on the heels of an outrageously one-sided

21   investigation by the University of Washington that WHOI was

22   aware of and was involved in monitoring and contact with, that

23   only can be explained by discriminatory animus against my

24   client based on his age, based on his gender.

25        I'll start with the age if I could.  Your Honor

1   brought up Larry Madin.  Again, we disagree with counsel's

2   characterization of his limited role.  His comment to Dr. Dick

3   that Dr. Dick is getting older and the world has moved on and

4   he needed to realize that and catch up with it, that really

5   shows the animus that WHOI had in this matter.

6       THE COURT:  So counsel, what do you say, though, to

7   the temporal, or lack of, connection between the timing of that

8   and then the investigation and then the discipline,

9   particularly where he was not involved in the investigation or

10   the disciplinary decision?

11       MR. FREIBERGER:  Yeah.  So Dr. Madin initially led the

12   investigation.  He notified Dr. Dick that there was some sort

13   of interpersonal incident that had arisen on the cruise, and he

14   had several conversations with Dr. Dick in early April.  He

15   told Dr. Dick not to bring witnesses.  He told Dr. Dick not to

16   submit his post-cruise assessment report from the cruise until

17   after they had met.  And he remained there, if we're going to

18   go with counsel's statement, through July 1.  WHOI received the

19   report from the University of Washington on May 22, 2019.  And

20   that's critical.  They sat on that report for over two months

21   but they had it.

22       We don't know, because we haven't done discovery, but

23   we will find out what exactly they did with that report from

24   May 22 until July when they brought in my client at which time

25   they showed him a heavily redacted version.  They didn't allow

1    him to keep a copy.  And they would not talk to the majority of

2    his witnesses even though, as we've attached statements from

3    those witnesses, seven witnesses total, refute and rebut the

4    conclusions of the report, both the University of Washington

5    report and the WHOI report.

6            The fact that they did not give Dr. Dick an unredacted

7    copy to keep and review is really telling.  University of

8    Washington -- subsequent to this, Dr. Dick made a public

9    records request of the University of Washington for that

10   report.  They turned over to him a fully unredacted report with

11   notes from witnesses and witness statements.

12           The fact that WHOI, his own employer where he has

13   tenure, took this type of flawed approach by not giving him the

14   report, not allowing him to defend himself, and then when he

15   did try to defend himself, they referred to him as arrogant and

16   defiant.  One of the people that WHOI interviewed was a

17   gentleman named Justin Smith who was a technician on the

18   cruise, and he referred -- we've alleged and we have it in

19   writing, he referred to Dr. Dick as a curmudgeon, which

20   Merriam-Webster defines as a crusty, ill-tempered and usually

21   old man.

22           He also wrote about Dr. Dick that, he compared Dr.

23   Dick's support for what he claimed were outdated dredging

24   techniques to, quote, 50 years ago, black people sat at the

25   back of the bus and women couldn't vote.  That still doesn't

1    make it right, close quote.  That's what Justin Smith said

2    about Dr. Dick.

3           THE COURT:  So I guess my question on that is how is

4    that attributable to these defendants?

5           MR. FREIBERGER:  Sure.  WHOI interviewed Mr. Smith and

6    found him to be credible.  WHOI interviewed Sonia Brugger and

7    found her to be credible.  But they didn't question them, we

8    don't believe, on any of these facts that would show that

9    they're clearly not credible.  They didn't question them on

10   what was the root of this, which is, Dr. Dick informed them

11   that he was going to issue a negative report coming off of this

12   cruise, and they got together and they created this fictitious

13   narrative that he was sexually harassing and/or creating a

14   hostile work environment or being whatever on this cruise when

15   all he did was have a disagreement professionally about the

16   best type of dredging technique in the South Indian Ocean.

17   That's where this all began.

18          And had WHOI done any sort of a fair, even-handed,

19   competent investigation, they would have looked into these

20   factors and these biases that the people that they found

21   credible had.  There's no way in our opinion at this early

22   stage to say that Justin Smith didn't taint or influence the

23   conclusion of the report if they found him to be credible.  Yet

24   those were his comments.  That was his viewpoint about Dr.

25   Dick.

1          We've already seen -- we've already spoken about Dr.

2    Madin and what was his viewpoint.  And we've talked about this

3    one-sided investigation.  And again, we've alleged that

4    Ms. Benjamin was in touch with the University of Washington

5    while they were doing this report and never once said, "Hey,

6    this is our senior scientist with tenure at our institution.

7    Would you like to speak with him?  Can we set that up?"

8          She was aware that they were conducting this

9    investigation and did nothing to notify Dr. Dick about it, did

10   nothing to say to him or to the University of Washington --

11         THE COURT:  Counsel, I think, I mean, I certainly

12   understand that part of the contentions at this part in terms

13   of sort of process.  What is less clear to me is because of

14   age, because of gender.  So I don't know if you want to say

15   more.  I know you've addressed the age, but I don't know if you

16   also wanted to address the gender since --

17         MR. FREIBERGER:  Sure.  It's our contention that his

18   female accuser was believed right from the get-go, and he was

19   painted as being guilty right from the get-go and never given a

20   fair shot.  And that's based on several factors.  One being

21   when he did bring up that he saw a graphic sexual image on

22   Sonia Bruger's computer, that was immediately dismissed out of

23   hand and it was characterized as him engaging in retaliation.

24   When he tried to defend himself by saying, I didn't do this,

25   and you should look at this fact or that fact and talk to this

1     person and this is why this occurred or that occurred, he was

2     referred to as arrogant and defiant.  No, we don't -- they

3     didn't go so far as to say it's because you're a man or it's

4     because of your age, but we certainly don't need to do that at

5     this stage.

6            So the fact is that when you take in combination this

7     incredibly unfair process, this immediately crediting a female

8     accuser as credible and treating him as guilty, combined

9     together and dismissing his statements, his witnesses, all of

10    it, we believe that that at the very least shows the

11    plausibility of gender discrimination because there was such a

12    rush to judgment on this.

13           THE COURT:  Thank you.

14           MR. FREIBERGER:  I don't know if I have any more time.

15           THE COURT:  You do, you have about three minutes or

16    so.  So, counsel, if you wanted to be heard on any of the other

17    claims.

18           MR. FREIBERGER:  Sure.  So just very briefly, maybe

19    I'll save just a minute.  But I think in terms of the breach of

20    contract, we believe that the defendants are trying to have it

21    both ways.  They're trying to disavow, disclaim these

22    contracts, but yet these are the documents that control Dr.

23    Dick's tenure as a senior scientist appointment and they offer

24    really important procedural safeguards prior to termination for

25    cause.

1          We understand that this was not an actual termination

2     for cause but it's a de facto by analogy termination for cause,

3     because by banning him from holding future leadership positions

4     or serving as a chief scientist, that really undercuts the

5     protections that are built in to him being a tenured senior

6     scientist.

7          Just, if you look at what those protections are, it's

8     pretty stark, right?  The protections are, prior to cause for

9     termination, Dr. Dick is entitled to notice in writing of the

10    reasons, two weeks to request an appeal, one month to prepare

11    for that appeal.

12         THE COURT:  And I guess, counsel, my problem there is,

13    so if I accept the argument that it is a contract and I read

14    the plain terms, the plain terms apply to a termination.  So

15    what would you have me do with that?

16         MR. FREIBERGER:  I would -- by analogy, Your Honor, I

17    believe that this has -- this edict of him not being allowed to

18    hold a leadership position, serve as chief scientist, it's so

19    critical to his career.  Again, the excerpt that's Exhibit B1

20    that talks about a senior scientist, it says their role is to

21    conduct independent scientific research and provide leadership,

22    and they're taking this away from him.

23         And so we would argue that by analogy, you can't do an

24    end run around this, around these protections because otherwise

25    they're meaningless.

1          THE COURT:  Thank you, counsel.  I think you are at

2     your time.  And also, for what's it's worth, I usually just

3     give the movant the opportunity for rebuttal.  Thank you,

4     counsel.  Mr. Curran, I think you had maybe two minutes.

5          MR. CURRAN:  Yes, thank you, Your Honor.

6          With respect to the discrimination claims, I mean, we

7     understand that Dr. Dick believes that he was treated unfairly,

8     and as I mentioned, he goes on at length about that in the

9     complaint.  But that's just simply not enough.

10          We're not trying to parse the complaint or, you know,

11     separate out.  We're looking for the facts, the facts of

12     alleged sex and age bias, which is what he needs to allege in

13     order to allege an age discrimination or a sex discrimination

14     claim.  And that's very clear from the case law, including, you

15     know, the *Morales-Cruz* case, which I keep coming back to, but

16     it's a First Circuit case.  It's extremely relevant on these

17     points, and it makes very clear that you can't just allege that

18     you were treated unfairly and that you're, you know, over age

19     40 or a man or a woman and then, voila, have an age

20     discrimination or sex discrimination claim.  You have to make

21     allegations of fact that connect what happened to you to your

22     age or to your gender.

23          So that's why we are looking in a detailed way at the

24     complaint of what exactly Dr. Dick alleges to support the age

25     discrimination and the sex discrimination claims.

1          With respect to the contract, I mean, the Blue Book is

2     not a contract.  The law is very clear that as long as there's

3     a prominently placed and clear disclaimer of contractual intent

4     in a policy document issued by an employer, that doesn't create

5     a contractual relationship.

6          And also, even if it is a contract, as Your Honor

7     pointed out, you know, there's nothing -- he hasn't been

8     terminated.  The actual language of the document refers to

9     termination of tenure.  There's no allegation that his tenure

10    has been terminated, and there also hasn't been any allegation

11    that he's been prevented from doing his job.  He can still act

12    as a senior scientist.  He can still do research.  He hasn't

13    alleged that he can't do research.  He hasn't alleged that he

14    doesn't still have tenure.  He hasn't alleged that any of those

15    things have happened.

16         All that's happened is he can't be the senior

17    scientist on a cruise, and he hasn't alleged that he can't do

18    his job without being able to do that.  In fact, it appears

19    that he did his job that way for a long period of time without

20    being a senior scientist on a cruise.

21         So he can still do research.  He can still exercise

22    leadership in his department.  So there's nothing that prevents

23    him from doing the things that are described as a senior-

24    scientist-with-tenure's role.

25              THE COURT:  Thank you.  Counsel, I appreciate the

1    argument on either side.  As I indicated before, I did read all

2    of the papers.  I'm going to go back to them with your

3    arguments today in mind and issue a decision.  So I'll take it

4    under advisement for the moment.  Thank you, counsel, and stay

5    well.  Thank you.

6              (Adjourned, 3:57 p.m.)

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Kelly Mortellite, Registered Merit Reporter

 4      and Certified Realtime Reporter, in and for the United States

 5      District Court for the District of Massachusetts, do hereby

 6      certify that the foregoing transcript is a true and correct

 7      transcript of the stenographically reported proceedings held in

 8      the above-entitled matter to the best of my skill and ability.

 9                    Dated this 22nd day of September, 2021.

10

11                    /s/ Kelly Mortellite

12                    _____

13                    Kelly Mortellite, RMR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```